J-S82022-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| MICHAEL HERNANDEZ | : | |
| | : | |
| Appellant | : | No. 3921 EDA 2017 |

Appeal from the Judgment of Sentence June 30, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0015339-2013

BEFORE: LAZARUS, J., OLSON, J., and STRASSBURGER*, J.

MEMORANDUM BY OLSON, J.: **FILED FEBRUARY 08, 2019**

Appellant, Michael Hernandez, appeals from the judgment of sentence entered on June 30, 2017, as made final by the denial of Appellant's post-sentence motion on July 20, 2017. We affirm.

The trial court thoroughly and ably summarized the evidence presented during Appellant's bench trial.

> [During Appellant's trial,] the Commonwealth presented the testimony of the [Victim, J.G.], as well as investigating Police Officer [Robert] Filler and Detective Ronald Kahlan. . . .
>
> [The Victim's Testimony]
>
> [On] November 20, 2013, the [Victim] was working as a pizza delivery person for DiNapoli's Pizza. He went on a delivery that evening in his car to 3735 [North] 7th Street. He had with him a pizza and cheesesteak to deliver to that location, together with the store receipt for the food which had printed on it the customer's phone number. The person answering the door at that address told [the Victim] that they did not

_____
* Retired Senior Judge assigned to the Superior Court.

order the food. [The Victim] then received a call from his store manager and based upon this call he drove his car further up that same block and parked it close to a parking spot outside 3725 [North] 7th and while he was attempting to get the food out of the other side of the car, a male, later identified as [Appellant], appeared, pointed a gun at his head and told him to "put the food on the step" and the [Victim] complied. [Appellant] then told [the Victim] to give him his money which he did, as well as his cell phone which [the Victim] retrieved from his delivery car. [The Victim] then got back into his car and drove away from the scene after being instructed by [Appellant] to "keep driving straight and don't come back, don't look back." As he was driving away he was able to see [Appellant] walk over to where the food was placed and pick it up.

According to [the Victim], his assailant was about 5'6" or 5'7" and was wearing a black vest and hoodie and had a mask covering the bottom half of his face, everything below the eyes. Although it was dark out[,] there were street lights and some house lights on and there was enough light so that he could see [Appellant's] face. Following the robbery, [the Victim] gave a statement to the police and was thereafter shown a photo array by the detectives and from that array he was able to pick out [Appellant] as the person who had robbed him.

On cross-examination [the Victim] stated that he had never seen [Appellant] before this incident and that the mask he was wearing came up above his nose. [The Victim] testified that the hood of [Appellant's] hoodie was not on during this incident and that the incident lasted about five to ten minutes. [The Victim] did acknowledge[] that at the preliminary hearing, which took place just a few weeks following the robbery, he testified that [Appellant's] hood was up, not down, and that the entire robbery took place in about 30-45 seconds. However, [the Victim] testified that there was no doubt in his mind that he was able to identify [Appellant] and that the detectives did not help him pick out [Appellant]. He told the detectives that the incident occurred at 10:30 [p.m]. Although [Appellant] was approximately 28 years old when the robbery occurred, [the Victim] told the detectives that the person who robbed him was about 18-20 years old. However, [the Victim,] when asked by defense

counsel how old [A]ppellant looked at trial that day responded that [A]ppellant looked to be 20-25 [years old].

[The Victim] confirmed that he had no doubt that [Appellant] was the person who robbed him that night. In response to the [trial] court's question as to why there was no doubt that [A]ppellant was the one who did this, [the Victim testified]:

[it wasn't just the eyes. It was the top half, so the top half of his face is exactly to the picture. . . . His eyes were bagg[y] and darker than most and you could tell if he was seen again. . . . His hair was exactly the same as the picture. N.T. Trial, 7/11/16, at 49].

. . .

[Investigating Police Officer Robert Filler's Testimony]

Officer Filler testified that on November 20, 2013, based upon a flash radio call he received, he went in his patrol car to the 3700 block of [North] 7th Street to look for a person who committed a gunpoint robbery, as well as to survey the block for cameras. He located a camera at 3735 [North] 7th Street and obtained the films from that camera which contained two [] different viewing angles. Portions of both tracks were played in court while Officer Filler testified as to what he observed on the videos as part of his investigation. . . .

Officer Filler testified that while viewing the video as part of his investigation, he believed he had found a point on the video that captured the encounter of the actual[] robbery. While the video played in court, Officer Filler testified as follows regarding what appeared to him to be the [Victim] and [Appellant]:

"Yes; the driver got out of the vehicle. Right at that area there was . . . an interaction. After the car drives off, we see an individual go into a house across the street. . . ."

The [trial] court then noted for the record that the video "appears to show two figures in back of the car, there was some walking around. . . . The car drives off . . . down the street. There's a figure of somebody walking on the sidewalk

- 3 -

and then entering a house that's approximately three houses down from where the car was stopped." Officer Filler testified that after viewing the video he went to the scene again to determine which house had a "screen door" that was seen opening on the video. Based upon this information, he determined that the property that the individual seen on the video entering was 3718 [North] 7th Street, as neither property on either side of this property had screen doors.

Officer Filler then testified that there was a food delivery receipt (Exhibit C-1) for the actual delivery in issue that was found hanging up in the store [DiNapoli's] during his investigation and that his investigation revealed that the customer phone number that was found printed on the receipt went to a payphone at 7th and Butler Streets near where the robbery had occurred.

On cross-examination, Officer Filler stated that he did not know if the 11:07 pm [] time stamp on the home surveillance film was accurate and acknowledged that although he didn't know the exact time the robbery occurred, he was able to narrow the time down working back from when his patrol car first drove down the street to investigate to when the robbery would have occurred. Officer Filler did not follow-up on why the store receipt of the delivery had a 'Departure Time' of 6:12:10. However, th[e trial] court notes that the [Victim] testified that the robbery occurred at 10:30 [p.m.] and Officer Filler testified that it was after that time that he received a radio call about a gunpoint robbery. Officer Filler acknowledged that given the poor quality of the video he could not say that it was [Appellant] on the video.

On redirect, Officer Filler testified that he was able to narrow the time sequence of events in the video because the video shows the delivery driv[er] actually coming to the address of 3735 [North 7th Street] and going up to the door and then shows the driver driving down the block to where the robbery occurred and this time period was not much further to when his patrol car drove down that street later that night.

. . .

[Detective Ronald Kahlan's Testimony]

As part of his investigation of the robbery [Detective Kahlan] viewed the surveillance video and saw a male run into a house. However, the detective agreed that he could not tell if the figure in the video was male or female. Similar to the testimony of Office Filler, Detective Kahlan testified that in viewing the video he determined that there was a screen door on the property that the figure seen in the video was seen entering and that the property address of 3718 [North] 7th Street was the only house it could be as the houses on either side of it did not have a screen door.

Detective Kahlan checked with the Bureau of Motor Vehicles for the address of 3718 [North] 7th Street and found that at that address there was one licensed driver and that a check of the driver's license photo of that driver matched the description given by the [Victim] of the person who had robbed him. Based upon that information, Detective Kahlan created a photo array and showed it to the [Victim], who selected [Appellant's] picture as the person who had robbed him. The detective put the photo array together using the description from [Appellant's] driver's license, as well as from the description given by the [Victim]. The computer then produced seven other photos which, together with that of [Appellant], form[ed] the photo array shown to the [Victim] two days after the robbery.

Detective Kahlan testified that he then obtained a search warrant for the property located at 3718 [North] 7th Street and upon execution, a black vest and a delivery receipt were recovered at the property. The delivery receipt (Exhibit C-7)[fn.3] was recovered in the middle of the first floor on the dining room table.

> [fn.3] Exhibit C-7 was the food delivery receipt recovered from [Appellant's] home whereas C-1 was a second food delivery receipt found hanging at DiNapoli's Pizza, where the [Victim] was working the evening he was robbed.

On cross-examination, Detective Kahlan confirmed that the [Victim] picked out [Appellant] as the one who robbed him "on his own" without being told by the detective, and that he told the detective that he recognized [A]ppellant's eyes. . . .

- 5 -

Trial Court Opinion, 2/15/18, at 2-7 (internal citations and emphasis and some internal capitalization and footnotes omitted).

The trial court found Appellant guilty of: robbery, persons not to possess firearms, theft by unlawful taking, receiving stolen property, carrying firearms in public in Philadelphia, possessing an instrument of crime, terroristic threats, simple assault, and recklessly endangering another person.[1] On June 30, 2017, the trial court sentenced Appellant to serve an aggregate term of ten to 20 years in prison for his convictions.

The trial court denied Appellant's post-sentence motion on July 20, 2017 and Appellant filed a timely notice of appeal.[2] Appellant raises one claim on appeal:

> Was the evidence insufficient to sustain the [trial] court's [decision] since the alleged perpetrator wore a mask obscuring his face and thereby render[ed] the [V]ictim's identification of [Appellant] inherently unreliable?

Appellant's Brief at 3.

---

[1] 18 Pa.C.S.A. §§ 3701(a)(1)(ii), 6105(a)(1), 3921(a), 3925(a), 6108, 907(a), 2706(a)(1), 2701(a), and 2705, respectively.

[2] The trial court ordered Appellant to file and serve a concise statement of errors complained of on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). Appellant complied with the trial court's order and, within Appellant's Rule 1925(b) statement, Appellant raised the following claim:

> Was the evidence insufficient to sustain the [trial] court's [decision] since the alleged perpetrator wore a mask obscuring his face and[,] thereby, rendering the [V]ictim's identification of [Appellant] inherently unreliable?

Appellant's Rule 1925(b) Statement, 11/9/17, at 1.

We review Appellant's sufficiency of the evidence challenge under the following standard:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Brown*, 23 A.3d 544, 559–560 (Pa. Super. 2011) (*en banc*), *quoting* *Commonwealth v. Hutchinson*, 947 A.2d 800, 805–806 (Pa. Super. 2008). As our Supreme Court has held, a claim that "the testimony presented to the [fact-finder] was so unreliable and contradictory that the[] verdict could only have been arrived at through speculation and conjecture . . . [is] a challenge to the sufficiency [of the evidence]." *Commonwealth v. Brown*, 52 A.3d 1139, 1156 n.18 (Pa. 2012).

According to Appellant, the evidence was insufficient to support his convictions because the "gunman's face was obscured by a mask." Appellant's

Brief at 9. Further, within Appellant's brief, Appellant claims that the evidence was insufficient because "the Commonwealth's case was riddled with inconsistencies." *Id.* The former claim fails; the latter claim is waived.

Appellant first claims that the trial court's decision was "pure speculation" and that the evidence was insufficient to support his convictions, as the "gunman's face was obscured by a mask." *Id.* In making this claim, Appellant apparently suggests that the mask's obstruction made it so that there was no way the Victim could have possibly identified Appellant as his assailant. This claim fails.

As the trial court explained, its decision was not the result of speculation or conjecture and the evidence was indeed sufficient to support Appellant's convictions:

> The [Victim] repeatedly testified [that he had] no doubt that [Appellant] was the individual who had robbed him. Although the perpetrator wore a mask which hid most of his face[, the Victim] described the perpetrator as having distinctive features – his "eyes were bagg[y] and darker than most" and his hair was "exactly" the same as the picture in the photo array.

Trial Court Opinion, 2/15/18, at 13-14.

The evidence also demonstrates that: immediately following the robbery, the assailant entered Appellant's house; the food receipt was found in Appellant's home; and, "a black vest described by [the Victim] as being worn by his assailant [was] found in [A]ppellant's house." *See id.* at 15-16.

Put simply, the evidence in this case was not "so unreliable and contradictory that the[ fact-finder's decision] could only have been arrived at through speculation and conjecture." **Brown**, 52 A.3d at 1156 n.18. Thus, Appellant's first sufficiency of the evidence claim fails.

For Appellant's second sub-claim on appeal, Appellant contends that the evidence was insufficient to support his convictions because "the Commonwealth's case was riddled with inconsistencies." Appellant's Brief at 9. This claim is waived, as the claim was never raised in Appellant's Rule 1925(b) statement. **See** Appellant's Rule 1925(b) Statement, 11/9/17, at 1 (Appellant claimed only that the evidence was "insufficient to sustain the [trial] court's [decision] since the alleged perpetrator wore a mask obscuring his face and[,] thereby, render[ed] the [V]ictim's identification of [Appellant] inherently unreliable"); **see also** Pa.R.A.P. 1925(b)(4)(vii) ("[i]ssues not included in the [Rule 1925(b) statement] . . . are waived").

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

_Joseph D. Seletyn_
Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/8/19